The Full Commission has, in accordance with the remand of this case from the North Carolina Court of Appeals, offered to all parties the right to submit additional evidence, none of the parties has submitted additional evidence; and having considered the contentions of the parties, the Commission makes the following Findings of Fact and Conclusions of Law establishing that Defendant Heatherlin Properties and Defendant The PMA Group are estopped from denying liability and coverage under the Workers Compensation Act and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Workers Compensation Act.
4. The employee suffered an accident on June 30, 1999 resulting in bones in both feet being broken.
5. The employees total medical expenses as of the date of the hearing were $15,435.94.
6. The extent of plaintiff s permanent disability is not to be determined at this hearing.
7. The parties stipulated into evidence, without the need for further authentication or verification, the following: a. Stipulated Exhibit 1, medical bills; b. Stipulated Exhibit 2, medical records; c. Stipulated Exhibit 3, medical report from independent medical evaluation performed by Dr. David N. Dupuy; and d. Depositions of William L. Riley, Linda Stroupe McMahan, and Ronnie Alien McMahan.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the additional:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 44 years old and had a high school education and 20 years of brick laying experience.
2. On June 30, 1993, while plaintiff was working on a roof laying bricks for a chimney, he walked over to the edge of the roof to get "mud from laborers and as he was doing so, slipped on tarpaper and fell off the roof. This constituted an injury by accident within the course and scope of his employment, which injury is compensable under the North Carolina Workers Compensation Act.
3. Plaintiff was taken to the emergency room where he presented with bilateral displaced calcaneal (heel) fractures. At that time, plaintiff was hospitalized for pain control, to evaluate his fractures and to obtain a CT scan. Plaintiff was treated by Dr. Thomas C. Friedrich, an orthopedic surgeon, who performed an operation on the fractures on July 4, 1993.
4. Plaintiff was followed after the surgery by Dr. Friedrich who first allowed plaintiff to put weight on his feet on September 23, 1993. He first suggested that plaintiff might seek vocational rehabilitation on December 22, 1993 when plaintiff was able to stand for two hours and would then have to rest for two hours. Upon his return to Dr. Friedrich on March 31, 1994, plaintiff reported that he could only stand for 30 minutes at a time and then it would take eight hours for him to be able to stand again. At that time plaintiff was released by Dr. Friedrich to return if he had further problems.
5. At the time of his injury on June 30, 1993, plaintiff was doing business with a partner, Charles Costner, as C J Masonry. Plaintiff and Mr. Costner had just started performing brick laying at C J Masonry when they began doing work under contract for Heatherlin Properties. Plaintiff and Mr. Costner were the principals in C J Masonry and there were two other laborers employed by them. C J Masonrys arrangement with Heatherlin Properties for brick laying, while not reduced to a written contract, was that C J Masonry was paid for the number of bricks laid. C J Masonry provided their own equipment. Heatherlin Properties made checks out to C J Masonry, and plaintiff and Mr. Costner paid their two employees. Mr. Costner was in charge of the business end of the partnership and took care of all the paperwork.
6. On and before June 30, 1993, Heatherlin Properties was an entity solely owned by Ronnie and Linda McMahan. Heatherlin Properties is and was engaged in the business of owning and operating several hundred rental properties as well as being engaged in the construction and sale of new homes. These were speculation houses and had the name of Ronnie and Linda McMahan on the deed. The building permit would be issued under Ronnie McMahans name. Mr. McMahan contracted with C J Masonry to do the brick laying for these houses. It was while working on one such house that plaintiff was injured on June 30, 1993.
7. Mr. and Mrs. McMahan worked together in all aspects of Heatherlin Properties and Mrs. McMahan often did much of the paper/office work. It was Mrs. McMahan who sought to obtain workers compensation coverage for Heatherlin Properties. Mrs. McMahan contacted Smith, York Insurance Agency for this purpose on or about August 28, 1992. Due to the nature of its business, Heatherlin Properties was an "assigned risk. The assigned risk pool is monitored and administered by the North Carolina Insurance Commissioner and North Carolina Rate Bureau. This pool places workers compensation insurance for businesses that might otherwise have trouble obtaining insurance. An application was completed by Mr. John Smith of the Smith, York Insurance Agency using information that he received from Mrs. Linda McMahan over the phone. On the application, Mr. Smith failed to indicate that Heatherlin Properties was in the construction business even though Mrs. McMahan told him this. Mr. Smith completed the form, signed it without sending it to Mrs. McMahan and submitted it along with the premium deposit to the North Carolina Rate Bureau. The North Carolina Rate Bureau assigned this policy to The PMA Group. Smith, York Agency is not an agent of the PMA Group and only offers policies issued from The PMA Group that are assigned by the risk pool.
8. Prior to C J Masonry beginning work for Heatherlin Properties, Mr. McMahan inquired whether or not C J had workers compensation insurance. Mr. Costner, plaintiffs partner in C J Masonry, indicated they had applied for workers compensation coverage and were expecting their policy to take effect at any time. Mr. McMahan indicated that C J Masonry could not work for Heatherlin Properties unless they had workers compensation coverage or unless he went to his carrier and obtained coverage for C J Masonry and its employees through Heatherlin Properties policy.
9. C J Masonry had indeed made application for workers compensation coverage prior to beginning work for Heatherlin Properties and that coverage became effective very shortly after plaintiffs June 30, 1993 injury. C J Masonry and plaintiff thus had "clean hands.
10. In approximately mid June 1993, C J Masonry began doing brick laying work for Heatherlin Properties under contract. Mr. McMahan agreed that when Mr. Costner came, he was to pick up the first draw for C J Masonry, he would leave C J Masonrys certificate of insurance. However, when, C J Masonrys first draw for $1,200.00 was picked up on or about June 24, 1993, no policy or certificate of insurance was left.
11. Thereafter. Mr. McMahan contacted Mr. Costner saying that he needed C J Masonrys certificate of insurance and that it should be left when Mr. Costner came to pick up C J Masonrys second draw on July 2, 1993 in the amount of $3,483.98. At that time Mr. Costner was once more told that if C J Masonry failed to produce its policy, Heatherlin Properties would have to deduct workers compensation premiums from C J Masonrys draw so that C J Masonry and its employees would be covered under Heatherlin Properties workers compensation policy. Again, when the July 2, 1993 draw was picked up, no workers compensation certificate of insurance or policy was left.
12. Thereafter, Mr. McMahan informed Mr. Costner that he would have to deduct premiums from C J Masonrys next draw not only for that week but also for the two preceding weeks as C J Masonry had failed to produce proof of workers compensation coverage. During that time, Mr. McMahan called the agency with which C J Masonry was dealing on its workers compensation coverage and received confirmation over the phone that it was anticipated that C J Masonrys policy would be received at any time and should already have been received.
13. Before the July 9, 1993 draw for C J Masonry was due, Mr. McMahan called the Smith, York Agency and indicated that he would like to add some bricklayers to his workers compensation policy and requested the rate for such workers. Mr. McMahan thereafter used that rate to deduct the amount of premiums from C J Masonrys draw, which would cover workers compensation insurance for plaintiff, Mr. Costner, and their two employees. Heatherlin was advised by Smith, York that nothing further needed to be done to bind coverage on the brick masons.
14. The July 9, 1993 draw, which Mr. McMahan cut to C J Masonry, reflected deductions for workers compensation premiums at a rate of $11.30 for the draw of July 9, 1993 as well as the two prior draws. Mr. McMahan withheld these amounts so that when the audit was performed by the PMA Group at the end of the year on his payroll, he could pay the additional premiums for C J Masonry.
15. Shortly before July 16, 1993, Mr. McMahan became aware that C J Masonry had a workers compensation policy that was effective from July 6, 1993 until July 6, 1994. Mr. McMahan therefore refunded one week of premiums that he had previously deducted from C J Masonrys draw. This indicated that Heatherlin intended that its workers compensation policy would cover C J Masonry and its workers from the beginning of their work for Heatherlin until C J Masonrys policy became in force.
16. Thereafter, Mr. and Mrs. McMahan became aware that plaintiff had injured himself when he fell off the roof on one of their properties on June 30, 1993.
17. No audit was ever performed on Heatherlin Properties for the year 1993. The PMA Group requested that Heatherlin Properties conduct its own audit by completing an audit work sheet. However, Heatherlin Properties contacted The PMA Group and requested that they have an onsite audit performed by PMA personnel.
18. In the "Part Five-Premium section of the policy, The PMA Group stated that the initial premium was only an "estimate. Specifically, it stated in subsection (E) that:"
 The final premium will be determined after the policy ends by using the actual, not the estimated, premium basis and the proper classification and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid us, you must pay us the balance.
In Section (C) (2), The PMA Group stated that the premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:"
 [A]ll other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof that the employers of these persons lawfully secured their workers compensation obligations.
In section (B) of Part Five, PMA stated that if the Information Page does not show the proper classifications, PMA would assign proper classifications, rates, and premium basis by endorsement to the policy.
18. The PMA Group was notified of plaintiffs injury on July 20, 1993 very shortly after Mr. Mrs. McMahan became aware of that injury.
19. A representative of the PMA Group testified that if an audit had been completed at the end of the year and plaintiff had not been injured, PMA Group would have charged additional premium if there were no certificate of insurance in the file for C J Masonry.
20. It is a general practice in the workers compensation insurance business that when additional workers are added and there is no certificate of insurance, additional premium for these workers is charged retroactively by the insurance company at the time of the audit.
21. Typically Mr. McMahan hired contractors to build houses on the property. He required the contractors to show proof of workers compensation insurance. If a contractor did not have insurance, Mr. McMahan deducted from the contractors pay an amount sufficient to cover insurance premiums for the workers. In turn, the McMahans insurer increased the premium amount charged to McMahans. The McMahans insurance agents informed them that this was standard practice in the business.
22. Heatherlin Properties owned a workers compensation insurance policy issued by the PMA Group prior to June 30, 1993. The payment provisions of the policy provided that "[The PMA Group] will pay promptly when due the benefits required of you by the workers compensation law. The policy information was subject to change by audit, which would adjust Heatherlin Properties premiums accordingly. The absence of a code specifying the type of employment does not exclude coverage for that type of employment. The policy is an automatic coverage except for excluded classifications, which are specifically laid out in the workers compensation manual used in underwriting such as, saw milling, which is a high hazard industry. Brick masonry is not an excluded classification and would have been subject to audit at the end of the year and would have owed monies for CJ Masonry. This was admitted by PMAs agent, Ms. Castalis and William Riley of Smith, York Agency, who wrote the PMA policy through the North Carolina Rate Bureau.
22. There was an expressed understanding between Mr. Purser and Defendant Heatherlin Properties that Heatherlin Properties would provide workers compensation coverage for him until CJ Masonrys coverage came into effect. Mr. Purser relied upon this representation, began work for Defendant Heatherlin and was injured before CJ Masonrys coverage came into effect. Defendant Heatherlin is estopped from denying liability under the Workers Compensation Act for the on-the-job injury suffered by Joe Neal Purser on June 30, 1993.
23. Defendant PMA Group is estopped from denying coverage inasmuch as carriers such as PMA (and PMA itself) routinely audit and collect premiums for workers added by insured employers even though the code for the type of work done by the worker is not specified, unless the work is classified extra hazardous such as saw milling. Brick masonry is not considered extra hazardous. PMAs own employee, Liz Castalis, admitted that PMA would have charged a premium on Mr. Purser in its annual routine audit had not the injury occurred. Because of the custom and usage in the insurance industry, no further action was required on the part of Heatherlin to bind coverage for Mr. Purser under its policy with PMA; however, Heatherlin took the affirmative steps of calling Smith, York Agency to determine the amount of the premium to be withheld for adding Mr. Purser pending PMAs audit, was advised by Smith, York Agency of the amount of the premium to be withheld for a brick mason and that no further action was necessary on Heatherlins part and thereafter withheld the premiums from Mr. Purser to cover the PMA audit. The doctrine of estoppel is a means of preventing a party from asserting a defense, which is inconsistent with its prior conduct.
24. Prior conduct involving PMAs dealings in the industry in the context of this case includes the course of dealing and the industry standards followed by PMA for adding workers to existing policies as discussed above.
25. Defendant PMA is estopped from denying coverage based upon the custom and usage in the industry and by the provisions of its own policy both of which provide coverage for workers added on by an insured employer. Plaintiff Purser was covered for this work related injury under Heatherlins policy of workers compensation coverage with PMA.
26. Plaintiff s average weekly wage was $500, which yields a workers compensation weekly wage of $333.34.
 ***********
Based upon the findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident within the course and scope of his employment. N.C. Gen. Stat. 97-2(6).
2. Defendant Heatherlin is estopped from denying liability under the Workers Compensation Act where it agreed to provide coverage for Mr. Purser under its policy until CJ Masonrys policy came into effect. Mr. Purser relied upon this representation, began work and was injured prior to CJ Masonrys insurance coming into effect. The law of estoppel applies in workers compensation cases and may be used to insure coverage of a work-related injury. This is so even though Mr. Purser would not otherwise have been an employee of Heatherlin Properties. Carroll v. Daniels and Daniels Construction Company, 327 N.C. 616, 398 S.E.2d 325
(1990), cited with approval in Purser v. Heatherlin Properties and the PMA Group, N.C. COA No. 99-446, April 4, 2000.
3. Defendant PMA Group is estopped from denying coverage inasmuch as carriers such as PMA (and PMA itself) routinely audit and collect premiums for workers added by insured employers even though the code for the type of work done by the worker is not specified, unless the work is classified extra hazardous such as saw milling. Brick masonry is not considered extra hazardous. Because of the custom and usage in the insurance industry as well as the terms of PMAs policy, no further action was required on the part of Heatherlin to bind coverage for Mr. Purser under its policy with PMA. See Godley v. County of Pitt, 306 N.C. 357,360, 293 S.E.2d 167, 169 (1982), Thompson v. Soles, 299 N.C. 484, 487,263 S.E.2d 599, 602 (1980), cited with approval in Purser v. Heatherlin Properties and The PMA Group, N.C. COA No. 99-446, filed April 4, 2000. The Commission concludes that the testimony and evidence supporting these conclusions of law are credible, are supported by the overwhelming weight of the evidence.
4. The Findings of Fact herein are consistent with facts previously found by the Commission, neither party sought to introduce additional evidence on remand and the Court of Appeals in its remand to the Full Commission authorized and directed the Full Commission to rely on Findings of Fact already made and to make such additional findings of fact as it deems necessary.
5. Plaintiff is entitled to recover total temporary disability benefits in the amount of two-thirds of his average weekly wage per week from June 30, 1993 until he returns to work at wages equal to or greater than his former wage or until further order of the Industrial Commission. N.C. Gen. Stat. 97-29.
6. Plaintiff is entitled to have defendants pay all medical bills incurred by plaintiff as a result of his injury by accident. N.C. Gen. Stat. 97-25.
 ***********
Based on the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff $333.34 per week from June 30, 1993 and continuing until he returns to work at his former wage rate or greater or until further order of the Industrial Commission. Such compensation as has accrued to the date of this Opinion and Award shall be paid in a lump sum, subject to attorneys fees hereafter awarded. Thereafter, defendants shall pay $333.34 per week to plaintiff, subject to attorneys fees hereafter awarded.
2. Plaintiffs attorneys are entitled to a reasonable attorney fee of 25 percent of the compensation awarded to plaintiff. Defendants shall pay directly to such attorneys 25 percent of the lump sum award and thereafter every fourth check.
3. Interest at the rate of eight per cent shall be paid to plaintiff on all sums due from July 15, 1996 until paid. All such interest shall be paid directly to plaintiff.
4. Defendants shall pay all of plaintiffs medical expenses with respect to injuries growing out of his compensable accident.
5. Defendants shall pay the costs.
This 1st day of March 2001.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/__________________ BERNADINE S. BALANCE COMMISSIONER